Zoning Board of Appeals of Amesbury *v.* Housing Appeals Committee.

## ZONING BOARD OF APPEALS OF AMESBURY *vs.* HOUSING APPEALS COMMITTEE & another.[1]

Suffolk. May 3, 2010. - September 3, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Housing. Zoning,* Low and moderate income housing, Housing appeals committee, Comprehensive permit, Conditions. *Statute,* Construction. *Administrative Law,* Agency's interpretation of statute.

This court concluded that the scope of a local zoning board's authority under G. L. c. 40B, § 21, to impose conditions on the issuance of a comprehensive permit to construct low or moderate income housing is limited to the types of conditions that the various local boards, in whose stead the local zoning board acts, might impose, i.e., matters of clear local concern, such as building construction and design, siting, zoning, health, and safety; thus, insofar as a local zoning board's conditions on the issuance of a comprehensive permit to construct low or moderate income housing included requirements that went to matters such as, inter alia, project funding, regulatory documents, financial documents, and the timing of sale of affordable units in relation to market rate units, those conditions were subject to challenge as ultra vires of the board's authority under § 21. [755-758]

This court concluded that the Housing Appeals Committee (committee) of the Department of Housing and Community Development, in reviewing conditions imposed by a local zoning board on the issuance of a comprehensive permit to construct low or moderate income housing, is authorized in the first instance to review and strike conditions that are not within the local zoning board's power to impose or that otherwise intrude impermissibly into areas of direct programmatic concern to State or Federal funding and regulatory authorities, separate from any analysis of whether such conditions render the project "uneconomic" as that term is defined in G. L. c. 40B, § 20 [758-763]; thus, the committee was within its power to strike or modify, by summary decision, conditions imposed by a local zoning board that concerned matters properly within the regulatory responsibility of State housing agencies or State and Federal funding and supervising agencies, and not of local concern [763-765].

CIVIL ACTION commenced in the Superior Court Department on November 16, 2007.

The case was heard by *Raymond J. Brassard,* J., on a motion for judgment on the pleadings.

---

[1]Attitash Views, LLC (Attitash).

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Jonathan D. Witten* (*Barbara M. Huggins* with him) for zoning board of appeals of Amesbury.

*David A. Guberman*, Assistant Attorney General, for Housing Appeals Committee.

*David J. Gallagher* (*Paul J. Haverty* with him) for Attitash Views, LLC.

The following submitted briefs for amici curiae:

*Jason R. Talerman & Lynnea Thody* for town of Sandwich.

*John Pagliaro & Martin J. Newhouse* for New England Legal Foundation.

*Paul D. Wilson & Benjamin B. Tymann* for Massachusetts Housing Finance Agency.

BOTSFORD, J. This case raises two related questions of statutory authority under the comprehensive permit act, G. L. c. 40B, §§ 20-23 (act): what is the scope of a local zoning board's authority under c. 40B, § 21 (§ 21), to impose conditions on the issuance of a comprehensive permit to construct low or moderate income housing; and what is the extent of authority vested in the Housing Appeals Committee (HAC) of the Department of Housing and Community Development (department) under c. 40B, § 23 (§ 23), to review any conditions that have been imposed? The questions arise in the context of the present appeal by the zoning board of appeals of Amesbury (board) from a judgment of the Superior Court affirming a decision of the HAC. For the reasons that follow, we conclude, in agreement with the Superior Court judge, that under § 21, the local zoning board's power to impose conditions is not all encompassing, but is limited to the types of conditions that the various local boards in whose stead the local zoning board acts might impose, such as those concerning matters of building construction and design, siting, zoning, health, safety, environment, and the like. We further conclude that in reviewing a developer's appeal from a comprehensive permit approved with conditions under § 23, the HAC is authorized in the first instance to review and strike conditions that were not within the board's power to impose, even though such conditions

may not render the project "[u]neconomic" as that term is defined in c. 40B, § 20 (§ 20).[2]

1. *Background.* The relevant facts are not in dispute. On June 2, 2005, pursuant to § 21, the developer, Attitash Views, LLC (Attitash), submitted an application to the board for a comprehensive permit. Attitash sought to construct a forty-unit condominium development, containing ten affordable units, at 131A Haverhill Road in Amesbury. The board held its first public hearing regarding the permit application on June 28, 2005, and subsequent hearings were held on various dates between June 28 and July 13, 2005. It was not until September 27, 2006, that the board issued its decision. At that time, it granted the permit application, but attached ninety-four conditions, some of which contained additional subconditions, to its approval. The subject matter of the conditions imposed on Attitash ranged from typical zoning issues, such as construction, density, and bedroom limitations, to nonzoning restrictions, such as land acquisition values and allowable profit, regulatory documents, and marketing.

On October 16, 2006, Attitash appealed from the board's decision to the HAC pursuant to G. L. c. 40B, § 22,[3] and in January, 2007, it filed a motion for summary decision.[4] Attitash

---

[2]We acknowledge the amicus brief of the zoning board of appeals of Sandwich in support of the zoning board of appeals of Amesbury (board), and the amicus briefs of the New England Legal Foundation and the Massachusetts Housing Finance Agency (MassHousing) in support of both the Housing Appeals Committee (HAC) and Attitash.

[3]General Laws c. 40B, § 22, provides in part:

> "Whenever an application filed under the provisions of [§ 21] is denied, or is granted with such conditions and requirements as to make the building or operation of such housing uneconomic, the applicant shall have the right to appeal to the [HAC] in the department of housing and community development for a review of the same. . . . Such decision may be reviewed in the superior court in accordance with the provisions of [c. 30A]."

[4]Title 760 Code Mass. Regs. § 30.07(4) (2004) provides in pertinent part:

> "*Motions for Summary Decision.* Any party may move, with or without supporting affidavits and a memorandum of law, for a summary decision in the moving party's favor upon all or any of the issues that are the subject of the appeal. The decision sought shall be made if the record before the [HAC], together with the affidavits shows that there is

included with its motion an affidavit of its counsel explaining
that he had received a letter from the manager of the Mas-
sachusetts Housing Finance Agency's (MassHousing's) compre-
hensive permits programs (MassHousing letter), and that Mass-
Housing had concerns with certain conditions imposed by the
board. A copy of the MassHousing letter, dated January 16,
2007, was attached as an exhibit. In Attitash's memorandum of
law in support of its motion, Attitash argued that several of the
conditions (or subsections of conditions)[5] imposed by the board
were legally beyond the authority of the board to impose; im-
properly infringed on the role of the State or Federal subsidiz-
ing agency in the comprehensive permit process; or rendered
the project uneconomic or otherwise incapable of obtaining
funding. Attitash included three additional exhibits with its
memorandum of law: (1) a copy of MassHousing's Form B-114,
entitled "Affordable Housing Restriction," and applicable to
projects in which affordability restrictions survived foreclosure;
(2) a memorandum addressed to "Local Officials and Housing
Colleagues" from the former director of the department, describ-
ing the limited role zoning boards of appeals may have in monitor-
ing of comprehensive permit projects; and (3) "Proposed Revi-
sions to Decision Pursuant to Memorandum of Law in Support
of Appellant/Applicant's Motion for Summary Judgment," a
document described by the HAC as a "red-lined" version of the
board's decision.[6] The board filed an opposition to the developer's
motion for summary decision, and included with it certain sup-
porting documentation.[7]

---

no genuine issue as to any material fact and that the moving party is
entitled to a decision in its favor as a matter of law."

[5]The conditions imposed by the board and challenged in whole or in part
by Attitash in its appeal to the HAC are set out in an Appendix to this opinion.

[6]On March 1, 2007, the board moved to strike the MassHousing letter at-
tached to the affidavit of Attitash's counsel, as well as the third exhibit
submitted with the memorandum of law, namely, the developer's proposed
revisions to the board's decisions. The HAC denied the board's motion, find-
ing that the MassHousing letter was admissible "since it is clearly the kind of
evidence on which reasonable persons are accustomed to rely in the conduct
of serious affairs," and that the "red-lined" version of the board's decision
was "an attempt by the developer to clarify and make concrete the modifica-
tions in the permit that it believes are legally required" and therefore was
"useful to the [HAC] and harmless to the Board."

[7]The board included with its opposition three exhibits, all of which were

By letter dated May 24, 2007, the presiding officer indicated that Attitash's appeal raised "emerging policy considerations" and sought the participation of both the department and Mass-Housing. In response to the invitation, the department filed a motion to participate as an interested person accompanied by a memorandum of law, and MassHousing drew the HAC's attention to a brief it had filed as amicus curiae in another appeal pending before the HAC that, in MassHousing's view, raised similar issues. After these submissions were filed with the HAC, the board requested an oral hearing, but the presiding officer determined that "the record [was] sufficiently clear," to decide the matter by summary decision without a hearing, and denied the request.[8]

The summary decision record before the HAC showed that Attitash was proceeding under two alternative funding programs. In particular, Attitash proposed to finance the condominium development under either the Housing Starts program, pursuant to which MassHousing would provide the subsidized funding, or the New England Fund, subsidized by the Federal Home Loan Bank of Boston. Under either funding program, Attitash would be unable to commence construction until it received final approval from MassHousing, and if the New England Fund subsidized the project, MassHousing would also serve as the project administrator. In this regard, the MassHousing letter submitted by Attitash stated that MassHousing would be unable to provide funding or allow the project to proceed if certain MassHousing requirements were made subject to local permit requirements, and specifically identified ten of the conditions imposed by the

---

letters written by the Inspector General of the Commonwealth and concerned ongoing monitoring of affordable housing developments pursuant to G. L. c. 40B, §§ 20-23 (act). In one such letter, addressed to the Executive Director of MassHousing and dated September 13, 2006, the Inspector General described the cost certification and monitoring process as "broken."

[8]See 760 Code Mass. Regs. § 30.07(1)(a) (2004) (decision whether to hold hearing on motion for summary decision within "the discretion of the presiding officer").

Subsequent to the date of the decision of the HAC, the Department of Housing and Community Development (the department) promulgated new comprehensive permit regulations, replacing 760 Code Mass. Regs. §§ 30.00 and 31.00 (2004), with 760 Code Mass. Regs. § 56.00 (2008). The new regulations are not applicable to this case.

457 Mass. 748 (2010)                                           753

Zoning Board of Appeals of Amesbury *v.* Housing Appeals Committee.

board that would prevent funding or the necessary final approval of the project.

On October 15, 2007, the HAC issued a summary decision, granting Attitash's motion and removing or modifying most of the conditions to which it objected. The HAC noted the board's argument that Attitash must prove that the conditions rendered the development uneconomic, but determined that the normal requirement of showing a condition to be uneconomic was inapplicable, as Attitash's challenge was to the legality of the conditions. In concluding that the board lacked the authority to impose the conditions, the HAC stated that the board went "beyond its traditional role of reviewing the siting and design of the housing development" and attempted to: "limit how the housing may be subsidized[;] involve itself in the drafting of the documents that ensure long-term affordability[;] shape the group of people who will be eligible to rent the housing[;] influence how the housing will be marketed[;] dictate how parts of the calculation of the profit limitation will be conducted[;] restrict the choice of the agent that will monitor the development[;] and otherwise insert itself into programmatic aspects of the development." The HAC further stated that while many of the conditions imposed by the board and objected to by Attitash were important to effective administrative and oversight of such a project, under the statutory scheme embodied in the act, these requirements were best reserved for State government rather than local zoning boards of appeal.

In November, 2007, the board timely filed an appeal from the HAC's decision in the Superior Court pursuant to G. L. c. 40B, § 22, and in July, 2008, it filed a motion for judgment on the pleadings, together with oppositions from Attitash and the HAC. A judge in the Superior Court heard the motion on January 7, 2009.[9] The judge provided an oral decision from the bench, denying the board's motion for judgment on the pleadings and

[9]As the dates in the text reflect, Attitash's efforts to obtain a comprehensive permit span a very lengthy history. Almost sixteen months elapsed between the time Attitash filed its application for the permit on June 2, 2005, and the board issued its decision on September 27, 2006; the HAC's decision was issued one year after Attitash filed its appeal from the board's decision, and nine months after Attitash filed its motion for summary decision; and the Superior Court hearing on the board's appeal, held January 7, 2009, took place fourteen months after the appeal was filed. (Fortunately, because the

ruling in favor of the HAC and Attitash.[10] Judgment affirming the HAC's decision entered two days later, and the board filed a timely appeal. We transferred the appeal to this court on our own motion.

2. *Discussion.* All parties agree that the focus of the HAC's review in this case was the board's "approval of [Attitash's] application with conditions." G. L. c. 40B, § 23.[11] In support of

judge issued his decision from the bench, there was no time lapse between the Superior Court hearing date and the date of the decision.) This extremely relaxed schedule of hearing and at least administrative decision flies in the face of the purpose of the comprehensive permit act, G. L. c. 40B, §§ 20-23 (act), which is to streamline the permitting process. See discussion in Part 2(b), *infra.*

[10]Although the judge concluded that the HAC had the authority under the act to determine whether the local board had exceeded its jurisdiction in imposing certain conditions on a developer, he concluded in the alternative that the contested conditions could be grouped into two categories. The ten conditions identified in the MassHousing letter properly could be struck by the HAC on the ground that they rendered the project uneconomic, but the remaining fourteen conditions would need to be the subject of a remand to the HAC, where Attitash would have the burden of proving that those conditions were uneconomic.

[11]The first paragraph of G. L. c. 40B, § 23 (§ 23), provides in part:

"The hearing by the [HAC] shall be limited to the issue of whether, in the case of the denial of an application, the decision of the board of appeals was reasonable and consistent with local needs and, in the case of an approval of an application with conditions and requirements imposed, whether such conditions and requirements make the construction or operation of such housing uneconomic and whether they are consistent with local needs. If the [HAC] finds, in the case of a denial, that the decision of the board of appeals was unreasonable and not consistent with local needs, it shall vacate such decision and shall direct the board to issue a comprehensive permit or approval to the applicant. If the [HAC] finds, in the case of an approval with conditions and requirements imposed, that the decision of the board makes the building or operation of such housing uneconomic and is not consistent with local needs, it shall order such board to modify or remove any such condition or requirement so as to make the proposal no longer uneconomic and to issue any necessary permit or approval; provided, however, that the [HAC] shall not issue any order that would permit the building or operation of such housing in accordance with standards less safe than the applicable building and site plan requirements of the federal Housing Administration or [MassHousing], whichever agency is financially assisting such housing. Decisions or conditions and requirements imposed by a board of appeals that are consistent with local needs shall not be vacated, modified or removed by the [HAC] notwithstanding that such decisions or conditions and requirements have the effect of making the applicant's proposal uneconomic."

the conditions it imposed, the board makes two general arguments. We consider them separately.

a. *The board's authority under G. L. c. 40B, § 21.* First, the board argues that under § 21, it has the authority to impose "appropriate conditions" dealing with the full panoply of issues that might pertain to a low or moderate income housing development, including those that are of concern to MassHousing as the State subsidizing and program supervising agency — for example, allowable profit margins, the contents of regulatory documents between Attitash and its funding agency, and marketing. Accordingly, the board states, "it is *the [b]oard's authority* to impose conditions pursuant to G. L. c. 40B that may not be usurped by the subsidizing agency" (emphasis in original). We disagree.

Section 21 provides in relevant part:

> "Any public agency or limited dividend or nonprofit organization proposing to build low or moderate income housing may submit to the board of appeals . . . a single application to build such housing in lieu of separate applications to the applicable local boards. . . . The board of appeals . . . shall have the same power to issue permits or approvals as any local board or official who would otherwise act with respect to such application, including but not limited to the power to attach to said permit or approval conditions and requirements with respect to height, site plan, size or shape, or building materials as are consistent with the terms of this section."

The clear import of this provision, defining as it does the board's power in terms of that belonging to a "local board," is that the board, when acting on an application for a comprehensive permit under the act, has the same scope of authority as "any town or city board of survey, board of health, board of subdivision control appeals, planning board, building inspector or the officer or board having supervision of the construction of buildings or the power of enforcing municipal building laws, or city council or board of selectmen." G. L. c. 40B, § 20 (definition of "[l]ocal [b]oard"). See *Dennis Hous. Corp.* v. *Zoning Bd. of Appeals of Dennis*, 439 Mass. 71, 78-79 (2003). In other words,

as defined in § 21, the power of the board derives from, and is generally no greater than, that collectively possessed by these other bodies.[12]

Because the board's authority is tied to that of "local boards," the scope of issues that it permissibly may address through conditions is necessarily limited to the types of concerns and powers of these boards. We have interpreted the listing of agencies and officials in the act's definition of "local board" in § 20 as representative rather than exact, and have looked at the functions they perform rather than their title. See *Dennis Hous. Corp.* v. *Zoning Bd. of Appeals of Dennis*, 439 Mass. at 78-79. These functions relate to matters of clear local concern, such as building construction, zoning and subdivision control, land use planning, as well as health and safety of local residents.[13] See *id.* This point is underscored by the provision in § 21 describing the board's power to attach to an approval "conditions and requirements with respect to height, site plan, size or shape, or building materials as are consistent with the terms of this section." See

---

[12]We add the word "generally" because the board may override a local regulation or requirement — such as a zoning provision — if it finds that the requirement is not "consistent with local needs." See *Mahoney* v. *Board of Appeals of Winchester*, 366 Mass. 228, 232-233 (1974), appeal dismissed, 420 U.S. 903 (1975), quoting *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 354 (1973). See also *Dennis Hous. Corp.* v. *Zoning Bd. of Appeals of Dennis*, 439 Mass. 71, 77 (2003).

[13]The definition of "[c]onsistent with local needs" in G. L. c. 40B, § 20, focuses on this same range of issues. The definition provides in part that "requirements and regulations" shall be considered "consistent with local needs" if:

> "they are reasonable in view of the regional need for low and moderate income housing considered with the number of low income persons in the city or town affected and the need to protect the health or safety of the occupants of the proposed housing or of the residents of the city or town, to promote better site and building design in relation to the surroundings, or to preserve open spaces, and if such requirements and regulations are applied as equally as possible to both subsidized and unsubsidized housing."

See 760 Code Mass. Regs. § 30.02 (2004) (defining "[l]ocal [c]oncern" as "the need to protect the health or safety of the occupants of proposed housing or of the residents of the city or town, to protect the natural environment, to promote better site and building design in relation to the surroundings, or to preserve open spaces").

*Zoning Bd. of Appeals of Groton* v. *Housing Appeals Comm.*, 451 Mass. 35, 40 (2008).[14]

The board points to the phrase in § 21 stating that its authority to "issue permits or approvals" in connection with a comprehensive permit application is the same as a local board, "*including but not limited to*" the power just described, namely, to impose conditions concerning "height, site plan, size or shape, or building materials" (emphasis added). In the board's view, this phrase operates as a springboard to a world of limitless opportunity and authority insofar as setting permit conditions are concerned. The board is mistaken. Established principles of statutory construction teach that the general phrase "conditions and requirements" in § 21 is cabined by the specific examples that follow it to conditions of the same or similar kind. See *Commonwealth* v. *Zubiel*, 456 Mass. 27, 31 (2010) ("When elements are listed in a series, the rules of statutory construction require the general phrase to be construed as restricted to elements similar to the specific elements listed"). See also *Powers* v. *Freetown-Lakeville Regional Sch. Dist. Comm.*, 392 Mass. 656, 660 & n.8 (1984), quoting *United States* v. *Powell*, 423 U.S. 87, 91 (1975) (principle of ejusdem generis is a "rule of construction . . . employed to ascertain the correct meaning of words by limiting 'general terms which follow specific ones to matters similar to those specified' ").

Following these principles, we conclude that although the board's condition-setting power under § 21 is not expressly confined to the four or five examples specifically mentioned in the section, that power is circumscribed in substance by those examples, and conditions imposed by the board must fit within

---

[14]As we have stated in *Zoning Bd. of Appeals of Groton* v. *Housing Appeals Comm.*, 451 Mass. 35, 40 (2008):

"The phrase 'permits or approvals,' read in the context of the entire Act, refers to building permits and other approvals typically given on application to, and evaluation by, separate local agencies, boards, or commissions whose approval would otherwise be required for a housing development to go forward. This interpretation is virtually compelled by the language, 'who would otherwise act with respect to such application,' appearing in § 21. The interpretation is further supported by the examples expressly cited in § 21, namely, action typically required by local permitting authorities with respect to 'height, site plan, size or shape, or building materials.' "

the same kind or class of local concern or issue that the examples address. Accordingly, insofar as the board's ninety-four conditions included requirements that went to matters such as, inter alia, project funding, regulatory documents, financial documents, and the timing of sale of affordable units in relation to market rate units, they were subject to challenge as ultra vires of the board's authority under § 21.

b. *The HAC's authority to review local zoning board conditions under G. L. c. 40B, § 23.* We turn to the board's second argument. Relying on our recent decision in *Board of Appeals of Woburn* v. *Housing Appeals Comm.*, 451 Mass. 581 (2008) (*Woburn*), and § 23 of the act,[15] the board contends that, in cases concerning an approval rather than a denial of a comprehensive permit application, the HAC's authority is restricted to the "narrow" and sequential considerations whether (a) Attitash, as the developer, proved that the board's conditions rendered its project "uneconomic,"[16] and (b), if Attitash met that burden, the board proved the conditions were nonetheless "consistent with local needs." See note 13, *supra.* The board's argument follows that because Attitash did not make the necessary "uneconomic" showing, the HAC could not entertain an assessment of local needs, and in particular, was without power to review, much less strike or modify, any of the board's conditions for any reason. The HAC takes a different view of § 23.

---

[15]The specific language in G. L. c. 40B, § 23 (§ 23), on which the board relies is the following: "[I]n the case *of an approval* . . . with conditions and requirements imposed" the hearing by the HAC "*shall be limited to the issue* of whether . . . such conditions and requirements make the construction or operation of such housing uneconomic and whether they are consistent with local needs" (emphasis added). See note 11, *supra.*

[16]General Laws c. 40B, § 20, defines the term "[u]neconomic" as:

> "any condition brought about by any single factor or combination of factors to the extent that it makes it impossible for a public agency or nonprofit organization to proceed in building or operating low or moderate income housing without financial loss, or for a limited dividend organization to proceed and still realize a reasonable return in building or operating such housing within the limitations set by the subsidizing agency of government on the size or character of the development or on the amount or nature of the subsidy or on the tenants, rentals and income permissible, and without substantially changing the rent levels and units sizes proposed by the public, nonprofit or limited dividend organizations."

It suggests that the section's provisions concerning the HAC's authority to review a local zoning board's approval of a permit application with conditions implicitly concern conditions within that board's power to impose; and that the section does not prohibit the HAC from undertaking to review a local zoning board's conditions to determine whether the conditions fit within the ambit of a local zoning board's authority under § 21. The HAC characterizes this type of review as one that is "antecedent" to its consideration whether the conditions render the project uneconomic, and, if so, they are "consistent with local needs." It argues that the exercise of this preliminary review is an appropriate way to further a core purpose of the act, that is, to streamline the process for obtaining the necessary authorization to build much needed low and moderate income housing. See, e.g., *Standerwick* v. *Zoning Bd. of Appeals of Andover*, 447 Mass. 20, 29 (2006).

In seeking to determine the meaning of a statute, we give "paramount importance to the language of the act in order to determine legislative intent." *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514, 523 (2007) (*Middleborough*), citing *Hoffman* v. *Howmedica, Inc.*, 373 Mass. 32, 37 (1977). However, where, as here, there may be ambiguity or a gap in the statute, "the details of legislative policy are to be spelled out 'in the first instance by [the] agency charged with administration of the statute.' " *Middleborough, supra,* quoting *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, 385 Mass. 651, 654 (1982). See *Taylor* v. *Housing Appeals Comm.*, 451 Mass. 149, 153-154 (2008); *Middleborough* v. *Housing Appeals Comm.*, *supra* at 523-524. Cf. *Goldberg* v. *Board of Health of Granby*, 444 Mass. 627, 632-633 (2005). We give "due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it," G. L. c. 30A, § 14 (7), and "apply all rational presumptions in favor of the validity of the administrative action." *Zoning Bd. of Appeals of Wellesley* v. *Housing Appeals Comm.*, *supra,* quoting *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977).[17] "[I]f the Legislature has

---

[17] With the exception of *Middleborough* v. *Housing Appeals Comm.*, 449 Mass. 514 (2007), the cases cited in the text concern regulations promulgated

not addressed directly the pertinent issue [in the statute], we determine whether the agency's resolution of that issue may 'be reconciled with the governing legislation.' *Nuclear Metals, Inc.* v. *Low-Level Radioactive Waste Mgt. Bd.,* 421 Mass. 196, 211 (1995). [This] stage of our analysis requires 'substantial deference' to the expertise and statutory 'interpretation of [the] agency charged with primary responsibility' for administering a statute. . . . [A] '[S]tate administrative agency in Massachusetts has considerable leeway in interpreting a statute it is charged with enforcing,' unless a statute unambiguously bars the agency's approach." *Goldberg* v. *Board of Health of Granby,* 444 Mass. at 633, quoting *Briggs* v. *Commonwealth,* 429 Mass. 241, 253 (1999), and *Berrios* v. *Department of Pub. Welfare,* 411 Mass. 587, 595-596 (1992).

"The Legislature's intent in [enacting G. L. c. 40B, §§ 20-23,] was to provide relief from exclusionary zoning practices which prevented the construction of badly needed low and moderate income housing." *Board of Appeals of Hanover* v. *Housing Appeals Comm.,* 363 Mass. 339, 353-354 (1973). See, e.g., *Standerwick* v. *Zoning Bd. of Appeals of Andover,* 447 Mass. at 28-29; *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership,* 436 Mass. 811, 820-821 (2002). "The statute reflects the Legislature's considered judgment that a crisis in housing for low and moderate income people demands a legislative scheme that requires the local interests of a town to

by the administrative agency in question — generally the department — pursuant to its statutory authority. The department is specifically authorized to promulgate regulations to implement the statute's provisions. See G. L. c. 23B, § 6. See also *Board of Appeals of Woburn* v. *Housing Appeals Comm.,* 451 Mass. 581, 598 (2008) (Marshall, C.J., concurring) (*Woburn*). However, we have accepted and applied the principle that an administrative agency "may adopt policies through adjudication as well as through rulemaking. . . . Policies announced in adjudicatory proceedings may serve as precedents for future cases." *Arthurs* v. *Board of Registration in Med.,* 383 Mass. 299, 312-313 (1981), and cases cited. See *Massachusetts Elec. Co.* v. *Department of Pub. Utils.,* 383 Mass. 675, 679 (1981). Cf. *Securities & Exch. Comm'n* v. *Chenery Corp.,* 332 U.S. 194, 203 (1947). As discussed *infra,* since 1992, the HAC in its adjudicatory decisions has followed a policy with respect to its review of local zoning board's conditions similar to the one it applied in this case. See, e.g., *CMA, Inc.* vs. *Westborough Zoning Bd. of Appeals,* No. 89-25 (June 25, 1992). See also, e.g., *Groton Residential Gardens, LLC* vs. *Groton Bd. of Appeals,* No. 05-26 (Aug. 10, 2006).

yield to the regional need for the construction of low and moderate income housing, particularly in suburban areas." *Standerwick* v. *Zoning Bd. of Appeals of Andover, supra* at 29. As we have noted in many other cases, to effectuate this purpose, the act establishes a streamlined comprehensive permitting procedure, which allows a developer to file a single application with the local zoning board of appeals for construction of low or moderate income housing. G. L. c. 40B, § 21. See, e.g., *Standerwick* v. *Zoning Bd. of Appeals of Andover, supra*; *Planning Bd. of Hingham* v. *Hingham Campus, LLC*, 438 Mass. 364, 369-370 (2003); *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership, supra* at 814-815. In addition to streamlining the permitting process, the Legislature sought to "promote affordable housing by minimizing lengthy and expensive delays occasioned by court battles commenced by those seeking to exclude affordable housing from their own neighborhoods." *Standerwick* v. *Zoning Bd. of Appeals of Andover, supra.*

The board's restrictive interpretation of the HAC's authority under § 23 would frustrate the purposes of the act. Cf. *id.* at 30 (abutting landowners claiming diminished real estate values did not have standing to challenge issuance of comprehensive permit, in part because purpose of act would be frustrated). As the HAC argues, if, on challenge by a developer, the HAC was without the authority to decide whether a condition was or was not permissible under G. L. c. 40B, § 21, the developer would be forced to file separate appeals: one with the HAC to challenge conditions on the ground that adherence to them would render the project uneconomic, and another in the Superior Court in the form of a declaratory action to determine whether the board had the authority to set the conditions in the first instance. The consequences of this dual system of review could be devastating in terms of costs and delays, and the creation of new affordable housing would be impeded or even prevented by such a tedious process. Such inefficiency is not consistent with the purpose of the statute, and an interpretation that embraces it should be avoided.

Where the focus of the statutory enactment is one of reform, as is indisputably true of the act, see *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. at 347, "the

administrative agency charged with its implementation should construe it broadly so as to further the goals of such reform." *Middleborough*, 449 Mass. at 524, quoting *Massachusetts Fed'n of Teachers, AFT, AFL-CIO* v. *Board of Educ.*, 436 Mass. 763, 774 (2002). In light of this principle, as well as the tenets we have discussed that generally govern our review of administrative action and the objectives of the act, we accept the HAC's reading of § 23 as reasonable, consistent with the statutory language and purposes, and appropriate. Thus, we conclude that under § 23, the HAC may, in the context of reviewing a developer's challenge to a local zoning board's approval with conditions, consider whether some or all of the challenged conditions are within the power of a local zoning board to impose or whether they otherwise intrude impermissibly into areas of direct programmatic concern to State or Federal funding and regulatory authorities. Authorizing the HAC to strike or modify conditions that fall outside the range of issues set out in § 21 — in addition to conditions that come within the scope of § 21 but are shown by the developer to render the project uneconomic — disposes of all related issues between the same parties in a single forum while providing an aggrieved party with the opportunity for review through an appeal to the Superior Court under G. L. c. 30A.

The interpretation of § 23 that we adopt here is not precluded by our recent decision in the *Woburn* case, where we reviewed the HAC's action of revising conditions imposed by Woburn's board of appeal, most significantly increasing the approved project size from 300 units to 540 units, after finding that the board's conditions did not make the project uneconomic. *Woburn*, 451 Mass. at 590. We emphasized that in the case of an approval with conditions, the provisions of § 23 require the HAC to subject conditions imposed by the board to an "uneconomic" analysis before balancing the conditions against local needs. *Id.* at 594. There is a critical distinction between *Woburn* and the present case. In *Woburn*, there was no claim by the developer, and no determination by the HAC, that the conditions set by the local board of appeals were beyond its statutory authority to impose under § 21 of the act. Rather, our discussion of § 23 in *Woburn* reflects an analysis of its clear requirements as applied to a set of conditions that the local zoning board was authorized

to impose, however onerous they might be. This case, unlike *Woburn*, involves consideration whether the HAC has the authority under § 23 to review conditions separate from any "uneconomic" analysis. We have determined that the HAC's interpretation of § 23, permitting this form of review, is appropriate.[18]

c. *The conditions struck or modified by the HAC in its summary decision.* The board asserts that the HAC erred in deciding this case by summary decision, which is the administrative equivalent of a motion for summary judgment.[19] The HAC concluded that summary decision was proper because the parties had no dispute about what the conditions attached to the board's grant of the comprehensive permit to Attitash were, and it was the conditions themselves that were at issue. The board now argues that this conclusion is incorrect, principally if not solely on the ground that issues of material fact exist as to whether the conditions rendered the project uneconomic. We have determined in this opinion that the HAC properly could focus on the nature of the board's conditions themselves before undertaking a review of whether they rendered Attitash's project uneconomic. We agree with the HAC that as to the terms of the conditions themselves, the record does not reveal any disputed issues of material fact, and the HAC was within its power to resolve the appeal before it by summary decision. We turn briefly to the conditions that Attitash challenged.

Generally speaking, the HAC's decision to modify or eliminate most of these conditions was based on a determination that they concerned matters that were properly within the regulatory responsibility of State housing agencies, such as MassHousing and the department, and not of local concern. The structure of the act itself reflects a "careful balance between leaving to local authorities their well-recognized autonomy generally to establish *local zoning requirements* . . . while foreclosing municipalities from obstructing the building of a minimum level

---

[18]Because we agree with the Superior Court judge that the HAC had the authority to entertain Attitash's challenges to the board's conditions on the grounds that they were ultra vires and independent of whether they rendered the project "uneconomic," we do not address the judge's alternative ruling. See note 10, *supra*.

[19]See note 4, *supra*, where the department regulation describing motions for summary decision is quoted.

of housing affordable to persons of low income" (emphasis added). *Woburn*, 451 Mass. at 584, quoting *Zoning Bd. of Appeals of Wellesley* v. *Ardemore Apartments Ltd. Partnership*, 436 Mass. at 822-823. We have discussed in Part 2 (a) the fact that the legitimate concerns of a "local board" generally pertain to building construction and design, zoning, health, and safety. See G. L. c. 40B, §§ 20, 21; 760 Code Mass. Regs. § 31.06(6) (2004). In contrast, the question, for example, of who should determine whether a developer had met the requirements of a limited dividend organization eligible to receive State or Federal subsidy "is properly left to the appropriate State or Federal funding agency." *Hanover* v. *Housing Appeals Comm.*, 363 Mass. at 379.[20]

Some of the challenged conditions — in particular, conditions 23, 26, 28, 29, 38, 39, 40, 42, 43F, 43G, and 43H — relate to regulatory documents (deed rider, monitoring services, and regulatory agreement); "Fannie Mae" affordable housing

---

[20]The HAC has relied on the *Hanover* case similarly to hold that certain other issues — financing arrangements, profit projections, developers' qualifications, and marketability — are also not intended for local concern. CMA, Inc. *vs.* Westborough Zoning Bd. of Appeals, No. 89-25, at 6-7 (June 25, 1992). See Groton Residential Gardens, LLC *vs.* Groton Bd. of Appeals, No. 05-26, at 13 (Aug. 10, 2006) ("the final terms of the regulatory documents are within the regulatory discretion of MassHousing").

The department's regulations sound a similar note. See 760 Code Mass. Regs. § 31.07(4) (2004), which provides:

"The following matters shall normally be within the province of the subsidizing agency and the [HAC] will not hear evidence concerning them except for good cause:

"(a) Fundability of the project by a subsidizing agency. In order to rebut the fundability presumption in 760 [Code Mass. Regs. §] 31.01(2), however, the Board may present evidence as to the status of the project before the subsidizing agency.

"(b) Marketability of the project.

"(c) The applicant's ability to finance, construct, or manage the project.

"(d) The financial feasibility of the project, what constitutes a reasonable return for a limited dividend developer, or whether the applicant is likely to earn reasonable return, except that evidence may be heard which is directly relevant to the issue of whether conditions make the project uneconomic (see 760 [Code Mass. Regs. §] 31.06[3]).

"(e) Tenant selection procedures."

restrictions (ownership nature of the project, number of affordable units and means of calculating income eligibility, and the manner of ensuring unit affordability in perpetuity); profit limitation; and marketing. We have earlier rejected the board's claim that these conditions were within its authority to impose simply because nothing in § 21 expressly bars it from doing so. These conditions do not relate to the class of local concerns contemplated by § 21, but as the HAC concluded, they fit within the responsibility of State or Federal funding and supervising agencies. There was no legal error in the HAC's treatment of the conditions. See G. L. c. 30A, § 14 (7) (*c*).

A review of the remaining conditions reveals that the HAC struck two of them in their entirety — viewing conditions 42 (requiring board approval of the project monitoring agent) and 54 (requiring that affordable units be constructed and sold coincident with the development of market rate units), as appropriately left to the subsidizing agency — but also appeared to acknowledge that other conditions may not have been beyond the board's authority to impose. The latter were either modified slightly or left unaltered.[21] Again, we discern no legal error in these determinations by the HAC.

---

[21]While the HAC noted that conditions 43A, 43B, 43D, 43K, 43L, 43N, 43W, and 59 improperly required the developer to appear before the board or other town official in the future for further review and approval, it does not appear that the HAC believed that requirements designed to ensure compliance with the comprehensive permit, State codes, and local restrictions were beyond the board's control. Rather, the process for such routine inspection was already clearly established. Thus, the HAC determined that the conditions were unnecessary or superfluous, and imposed minor modifications to them. Similarly, conditions 18, 19, and 20, together, required the developer to comply with local zoning, subdivision, wetlands, and public health requirements. Again, the HAC recognized that the developer need comply with local requirements, but modified the provisions only to ensure that compliance was measured by local requirements in effect on the date of the application to the board, rather than at the time of the board's decision or when a building permit is sought. Cf. *Zoning Bd. of Appeals of Canton* v. *Housing Appeals Comm.*, 451 Mass. 158, 161 (2008); *Taylor* v. *Housing Appeals Comm.*, 451 Mass. 149, 155 (2008).

The HAC's replacing of condition 43E with the language proposed by Attitash appears to recognize that the board can require some sort of written communication from the lender and State or Federal agency regarding the receipt of funds and project and site approval prior to the commencement of construction of the affordable housing project, and its modification of condition

3. *Conclusion.* The only decision or order of the HAC in the record of this case is its summary decision. For all the reasons discussed, we agree with the Superior Court judge that the substance of the HAC's summary decision in this case was correct. However, at the decision's conclusion, the HAC allowed Attitash's motion for summary decision in its entirety, even though the HAC, in the body of its ruling, had rejected some of Attitash's challenges to the board's conditions in whole or in part. In the circumstances, we remand this matter to the Superior Court with the direction in turn to remand it to the HAC for modification of its disposition of Attitash's motion for summary decision in a manner that will reflect precisely which of the conditions challenged by Attitash have been struck, which have been modified, and which have been retained.

*So ordered.*

APPENDIX.

The following are the conditions imposed by the Board of Appeals of Amesbury that were challenged in whole or in part by Attitash Views, LLC, the developer, in its appeal to the Housing Appeals Committee.

"In accordance with the powers conferred to the Board by 760 [Code Mass. Regs. §] 31.08(4), if construction (including site clearing and grading) authorized by this Decision has not begun within twenty-four (24) months of the date on which the Permit becomes final, the Permit granted by this Decision shall lapse and become void ab initio, and shall be considered without force or effect. . . .

"*Local Requirements*

"18. Except as expressly waived by this Decision:

"A.   The development of this Project, including the construction of all dwelling units, utilities, roads, drainage structures and other appurtenances, shall comply with the Amesbury Zoning By-Law in effect at the time of this Decision and Permit.

"B.   The development of this Project, including the construction of all dwelling units, utilities, roads, drainage structures, and other appurtenances, shall comply with the Amesbury Subdivision Rules and Regulations in effect at the time of this Decision and Permit.

79 confirms that the board can require the developer to assess peer review fees.

The HAC declined to modify the following conditions: the preamble (fourth par.: requiring construction to commence within two years); condition 43J (requiring compliance with stormwater management requirements); and condition 77 (requiring completion of construction within five years).

"19. Except as waived by this Decision or a decision of the Amesbury Conservation Commission, the development of this Project shall comply with the Amesbury Wetlands Bylaw and Amesbury Conservation Commission Regulations in effect at the time any building permit is sought for a dwelling unit or for any jurisdiction for roadway-associated construction, and with all rules, regulations, filing and permit requirements and certifications of the Amesbury Conservation Commission with respect to natural resource protection, construction of storm water management structures within the Buffer zone and their disposal, construction of other structures including retaining walls within the Buffer Zone, and wastewater disposal. . . .

## "*Density; Dwelling Units and Bedroom Limitations*

"23. The total number of dwelling units, each of which shall be dwelling units available for sale, shall not exceed forty (40). All dwelling units shall be made available for, and conveyed in, fee simple. No dwelling unit shall at any time be made available for rental purposes. . . .

## " '*Affordable Units*'

"26. Not less than twenty-five (25%) percent of the total number of dwelling units approved, i.e., no fewer than ten (10) units, shall be affordable to individuals and/or families earning no more than eighty (80%) percent of the median income of current residents of Amesbury. (The 'affordable dwelling units' or 'affordable units'). The calculation of what constitutes the median income of the current residents of Amesbury shall be based on formulas or the methodology published by the Department of Housing and Community Development (DHCD), as revised. . . .

"28. Each affordable unit shall be sold pursuant to an affordable housing restriction, more fully described below, ensuring that only income eligible individuals or families may purchase the dwelling unit.

"29. An affordable housing restriction, enforceable by the City of Amesbury, requiring that the affordable units remain affordable in perpetuity and in a form approved by Counsel for the City, shall be recorded senior to any liens on any land or dwelling unit within the limits of the Project to protect the requirement for the affordable units in the event of any foreclosure, bankruptcy, refinancing or sale. Should the Applicant after diligent efforts be unable to obtain any reasonable financing due to the aforementioned requirement that the affordable housing restriction is senior to any liens, the Applicant may then request the Board waive or modify the affordable housing restriction. Upon a showing that the Applicant has been unable to obtain any reasonable financing despite diligent efforts because of the affordable housing restriction, then the Board may waive or modify the same to the extent necessary to permit the Applicant to obtain reasonable financing. . . .

## "*Profitability*

" . . .

"38. Any profit that is above the allowable profit pursuant to the Regulatory Agreement or twenty (20%) [percent] of total development costs, whichever is lesser, shall be returned to the City of Amesbury for use in the development of the Town's [*sic*] affordable housing inventory. The

768 457 Mass. 748 (2010)

Zoning Board of Appeals of Amesbury v. Housing Appeals Committee.

profit limitation may be enforced by a certified cost accounting by a Certified Public Accountant, hired by the City of Amesbury at the completion (or cessation of six months or more) of development by the Applicant.

"39. The allowable profit must reflect a land value based upon appraised fair market value as of the effective date of this Permit under existing zoning regulations for uses allowed as of right and without a comprehensive permit in place. The Board rejects the land acquisition price included in the Applicant's Development Budget (dated June 23, 2006) because it is based on a seventeen (17) lot cluster subdivision that has not been approved by the Planning Board.

"40. The Applicant shall provide the Board with a copy of all financial documentation required by the Regulatory Agreement. The Board requires a full compilation and certification of total development costs and total revenues on a federal income tax basis according to generally accepted accounting standards within 30 days after the end of each tax year until the project is completed and each of the dwelling units have been sold by the Applicant. . . .

"*Conditions Precedent to Commencement of Project*

"43. The conditions below are conditions precedent to site disturbance. In particular, and without limitation, no grading, land disturbance, or construction of any structure or infrastructure shall commence until:

"A. Final Review — Prior to commencement of any construction and granting of any permits on the Project, the Applicant has submitted detailed construction drawings to the Board to ensure that said drawings are consistent with this Permit, with local requirements not waived in the Permit, and with state and federal codes. Copies of the detailed, approved construction drawings (the 'Final Plans') should also be filed in hard copy (20 full-scale sets) and in digital form with the Board and the Building Department for record keeping purposes. The Applicant must secure Board approval prior to construction and allow the Board forty-five (45) days to review the detailed construction drawings. The Final Plans shall including a Building Code review. . . .

"D. The Final Plans, including phasing plans, way and underground utilities plans (water system, stormwater system, gas, telephone, electric and cable systems), entrance/intersection streetlights and signs, have been reviewed and have received approval consistent with this Decision by the Board, and consistent with their respective jurisdictions by the Amesbury Conservation Commission and the Amesbury Board of Health, and any and all relevant federal and state agencies, departments, boards or commissions for matters not otherwise approved or waived by this Decision.

"E. MassHousing has supplied the Board with written correspondence indicating that it will provide the funds necessary to complete the Project (pursuant to the Housing Starts program) and that MassHousing understands and will assure compliance with the terms and conditions of this approval. The responsibilities of this condition are non-transferable and non-assignable. A commitment of financing shall be forwarded to the Board from MassHousing.

457 Mass. 748 (2010)                                             769

Zoning Board of Appeals of Amesbury v. Housing Appeals Committee.

"F. The Applicant, the Board and DHCD have executed a Deed Rider, similar in form to that published by MassHousing but revised in content as required for consistency with this Decision. The Deed Rider shall be subject to review and approval by the Board and its legal counsel as to form and consistency with this Decision, said approval not to be unreasonably withheld. The Deed Rider shall be executed and recorded to ensure that the terms of this Decisions are perpetually enforced.

"G. The Applicant, the Board and DHCD have executed a Monitoring Agreement, similar in form to the Monitoring Agreement published by MassHousing but revised in content as required for consistency with this Decision. The Monitoring Agreement shall be subject to review and approval by the Board and its legal counsel as to form and consistency with this Decision, said approval not to be unreasonably withheld.

"H. A Regulatory Agreement, similar in form to that published by MassHousing or DHCD but revised in content as required for consistency with this Decision and subject to the terms and conditions of this Decision, has been executed by the Applicant and DHCD and has been recorded with this Decision. These documents shall contain, at a minimum, the following terms:

"i. The affordable units shall be restricted as affordable in perpetuity to households with less than 80% of the applicable area median income.

"ii. The Monitoring Agent for this project. The Board specifically disapproves of the use of Citizens Housing and Planning Association (CHAPA) as the monitoring agent for this project.

"iii. An identification of the affordable units.

"The Regulatory Agreement shall be subject to review and approval by the Board and its legal counsel as to form and consistency with this Decision, said approval to not be unreasonably withheld. . . .

"J. The Applicant has submitted to the Board, the Massachusetts Department of Environmental Protection (DEP), the Amesbury Conservation Commission, and all other relevant public agencies, for review and final acknowledgment of consistency with this Decision, final and detailed stormwater management plans and improvements in accordance with the standards set forth in the Amesbury Subdivision Rules and Regulations not waived by this Decision, and with DEP's Storm Water Management standards, policy and handbooks, to the detail required for use as on-site construction drawings and to obtain approval under the Massachusetts Wetlands Act and the Amesbury Wetlands Protection Bylaw and Regulations except as waived by this Decision. These plans and improvements shall address the effects on abutters and assure that there will be no detrimental drainage or erosion impact on the abutting properties.

"K. Final and detailed landscaping improvements and plans prepared by a Landscape Architect registered in the Commonwealth of

770                                         457 Mass. 748 (2010)

Zoning Board of Appeals of Amesbury *v.* Housing Appeals Committee.

Massachusetts to the detail required for use as on-site construction and planting drawings and/or to obtain a building permit in accordance with the State Building Code, whichever requirement is more detailed, have been submitted to the Board and all other relevant public agencies for review and approval, including acknowledgment of consistency with this Decision. Such plans shall include shade trees along streets, and shall specify the types, number, size and location of all proposed landscaping plants, trees and shrubs at the time of planting, the location and type of fence or other screening materials, plans and profiles of all planting and screening materials and details of any and all other proposed landscape materials. Such plans indicate the specific types of active/passive recreational equipment to be installed within the open space and recreational areas located on the approved plans. Trail networks shall be laid out allowing public access to permanently protected open space and connecting to abutting conservation areas and Lake Attitash. Details should be provided for trail markers at major locations and signage for the proposed trails. Such plans shall also indicate the location of mailboxes, dumpsters and other appurtenant structures to be located within or integral to, the project. . . .

"N. A detailed plan showing landscaping improvements, open areas, limit of construction activity, edge of clearing, sedimentation and erosion controls, a soil stockpiling area, and construction staging, refueling and storage area(s), for verification that such plan conforms with this Decision. Tree protection measures shall be stated with details for tree wells around existing trees to be protected included in the plan set. The removal of trees, shrubs, and natural ground cover on the site shall be minimized to preserve the natural environment to the highest degree possible. All trees over 8" in caliper within the limits of work shall be flagged prior to tree clearing. A representative of the Board and the Town [*sic*] Planner shall identify trees that need to be protected and preserved during construction. . . .

"Q. The Applicant has provided the City of Amesbury, in form and substance approved by counsel for the City of Amesbury, Applicant's agreement that the City of Amesbury shall be free of any liability for any act, omission or negligence caused by the Applicant, its employees, agents, subcontractors, beneficiaries or trustees with relation to this Project, and that Applicant on behalf of itself and its successors and assigns has consented and agreed to indemnify the Town, its employees and officials for any harm, damage or injury [caused] by the Applicant, its employees, agents, subcontractors, beneficiaries or trustees with regard to this Project.

"R. The Applicant has filed with MEPA unit of the Massachusetts Executive Office of Environmental Affairs an Environmental Notification Form or Notice of Project Change adequately describing the Project as permitted by this Decision and has received all necessary permission from the Executive Office of Environmental Affairs. . . .

"W. All dead-ends drives and parking areas have been designed to provide a cul-de-sac or adequately-sized hammerhead-T turn-

around, approved by the Fire Chief, to facilitate emergency access and increase fire safety. . . .

*"Conditions Relating to Construction*

" . . .

"54. Affordable housing units shall be constructed and sold coincident with the development of market rate units. In no event shall the number of affordable units built and sold relative to the number of market rate units built and sold be less than that set forth in the schedule below:

"For the purposes of this section, 'built' means constructed to a degree sufficient for issuance of a certificate of occupancy. Prior to the issuance of the certificate of occupancy for the last-to-be-sold market rate dwelling unit in any phase of the Project, the Applicant shall complete construction, obtain certificates of occupancy for, and sell all of the affordable dwelling units in that phase. . . .

"59. A design theme has been stated in writing and submitted to the Board for approval. The theme shall include descriptions of exterior building materials, architectural design, street furniture, fencing, and a statement of the means of assuring that the affordable dwelling units are compatible with the design theme and are indistinguishable in architectural style and finish materials from the market rate units. . . .

*"Administrative*

" . . .

"77. Time limit to build: The Applicant shall *complete* construction within five (5) years from the date this Permit becomes final, [after] which this Permit shall lapse, unless such time shall be extended in writing by the Board.

"78. The Applicant has provided to the City of Amesbury, in form and substance approved by counsel for the City of Amesbury, Applicant's agreement that the City of Amesbury shall be free of any liability for any act, omission or negligence caused by the Applicant, its employees, agents, subcontractors, beneficiaries or trustees with relation to this Project, and that Applicant on behalf of itself and its successors and assigns has consented and agreed to indemnify the City, its employees,

agents and officials for any harm; damage or injury caused by the Applicant, its employees, agents, subcontractors, beneficiaries or trustees with regard to this Project.

"79. The fees for the engineering and legal reviews and the town's construction oversight shall be the obligation of the Applicant. Prior to the commencement of work by a particular consultant, the Applicant shall pay the estimated fees for the required work. No ground disturbance or clearing shall commence until all past and estimated fees are paid."